# In the United States Court of Federal Claims

No. 17-488L
(Filed: December 21, 2017)

```
*************************************
YANKTON COUNTY, SOUTH            *
DAKOTA, a County of the State of *
South Dakota,                    *
                                 *     RCFC 12(b)(1); Takings Clause of the
             Plaintiff,          *     Fifth Amendment; 28 U.S.C. § 2501;
                                 *     Statute of Limitations; Claim Accrual;
v.                               *     Stabilization Doctrine; Justifiable
                                 *     Uncertainty
THE UNITED STATES,               *
                                 *
             Defendant.           *
*************************************
```

Mark V. Meierhenry, Sioux Falls, SD, for plaintiff.

Carter F. Thurman, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

      In this case, plaintiff Yankton County, South Dakota ("Yankton County") alleges that certain dam construction and operation activities undertaken by the United States Army Corps of Engineers ("Corps") along the Missouri River have led to an unnatural alteration of the river's stream bed, effecting a taking of plaintiff's property and damages to two bridges owned by plaintiff without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. Plaintiff seeks $11.5 million in damages plus attorney's fees, costs, and expenses. As explained below, because plaintiff's claim accrued more than six years before plaintiff filed suit, this court lacks jurisdiction over the instant case.

## I. BACKGROUND

      The Missouri River is the "longest river in North America," extending approximately 2,341 miles from western Montana to just north of St. Louis, Missouri, where it joins with the Mississippi River.[1] Compl. ¶ 5. Gavins Point Dam, which is located west of the city of Yankton

---

      [1] The facts in this section—which are undisputed for the purpose of resolving defendant's motion to dismiss—derive from the complaint, the parties' submissions (including attached exhibits), and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.

in Yankton County, South Dakota, is the furthest downstream dam along the Missouri River.[2] Id. ¶¶ 6-7. The first major tributary entering the Missouri River downstream from Gavins Point Dam is the James River. Id. ¶ 21. The James-Missouri confluence is east of the city of Yankton in Yankton County, South Dakota. Id. ¶ 20. Plaintiff owns two bridges that cross the James River: Fleeg's Bridge, which is approximately four miles upstream from the James-Missouri confluence at County Road 366, and Johnson Bridge, which is further upstream at 303rd Street. Id. ¶¶ 31-33.



Healy Aff. Ex. 3 at 8.

Construction of Gavins Point Dam was completed in 1955. Compl. ¶ 11. Operated by the Corps, its purpose is to "provide flood control[;] assure an adequate supply of water for navigation, irrigation, stream sanitation[,] and municipal use[;] and generate and sell electrical power." Id. ¶ 10. Directly above the dam is the Lewis and Clark Lake reservoir. Id. ¶ 13.

---

[2] Yankton County is located in the southeast portion of South Dakota. See, e.g., South Dakota Counties, United States Census Bureau, https://www2.census.gov/geo/maps/general_ref/stco_outline/cen2k_pgsz/stco_SD.pdf (last visited Dec. 19, 2017).

### A. Impact of Dam Construction

A river current washes away sediment from banks and riverbeds. See Healy Aff. Ex. 3 at 13. The river itself maintains equilibrium by replacing the sediment that is washed away with sediment deposited from upstream. Id. When a dam is constructed, a reservoir forms as a result of water being held back, and the flow of water slows at it enters the reservoir. Compl. ¶¶ 13-14. The slowing water causes sediment to settle to the bottom of the reservoir, and water released from the dam is typically clear water. Id. ¶¶ 14-15.

Following construction of the Gavins Point Dam, the riverbed of the Missouri River below the dam degraded due to the lack of available sediment to "reestablish the sediment load lost above." Id. ¶ 15. Degradation—i.e., the lowering of the riverbed—causes erosion of a river's banks as the river seeks to maintain a natural grade. Healy Aff. Ex. 3 at 14. At the James-Missouri confluence, degradation has caused an over nine-foot drop in the elevation of the Missouri River riverbed between 1955 and 2010. Id. at 28-29. The degradation of the Missouri River due to "sediment trapping by the [Lewis and Clark Lake] reservoir formed by Gavins Point Dam" has been "well documented" since the 1980s and was "known to the [Corps] in the 1950s when the dam was being constructed." Healy Aff. Ex. 3 at 4-5; see, e.g., Def.'s Mot. Ex. A at 9 (chart showing the decline of water surface elevation of the Missouri River at the James River confluence and other locations from 1956 to 2001). More generally, "[t]he effect of sediment trapping on downstream channels has been studied by numerous geomorphologists" over the past half-century. Healy Aff. Ex. 3 at 5; accord id. at 59-61 (containing a sample of published studies regarding riverbed degradation from as early as 1943).

The James River pushes sediment into the Missouri River to mitigate the latter's sediment deficiency. Id. at 9-14, 18. This process is known as head cutting or channel incision.[3] Compl. ¶ 23. Head cutting takes place "when a stream or river erodes its bed and 'incises' vertically into the bed of the river or stream channel" as a result of "an imbalance between incoming and outgoing sediments." Healy Aff. Ex. 3 at 4. In the instant case, the "artificially lower surface water elevation on the Missouri [River] results in a steeper gradient on the Lower James River[, which] increases flow velocities and sediment transport," resulting in head cutting. Compl. ¶ 28.

> For tributaries, their local base level can be raised or lowered by the trunk river. As the Missouri River degraded its bed, it lowered (or dropped) the local base-level for its tributaries. The drop in local base level caused an increase in the channel slope for the lower James River and this led to erosion of the James River channel in a process called headward erosion. Headward erosion starts at the mouth of a tributary and progresses upstream in the form of a knickpoint (or headcut). As the knickpoint progresses

---

[3] Channel incision typically refers to the erosion of "smaller rivers and stream channels," while degradation refers to the "erosion of larger rivers." Healy Aff. Ex. 3 at 4 n.1.

> upstream, it lowers the bed and increases the bank heights. Steep, tall and unstable banks are characteristic of incised channels and they have been found to <u>follow a predictable sequence of channel changes</u> including down-cutting and bank widening. . . . [H]eadward erosion can progress many 10s or 100s of miles upstream of the initial cause of base-level drop. . . . Missouri River degradation propagated into tributary streams and rivers in the form of knickpoints (headcuts) and the degradation migrated many tens-of-miles upstream into the tributary's drainage network.

Healy Aff. Ex. 3 at 6 (emphasis added) (citations omitted) (relying on published studies from 1983, 1986, 1989, 2007, and 2009). For example, in 1989, the Corps published a report containing a conclusion that "Missouri River degradation caused the lower James River to erode its channel." <u>Id.</u> at 20.

In turn, channel incision causes channel widening:

> Channel widening occurs in incised channels because the banks become overstepped and fail by mass wasting (landslides and rotational slumps). . . . [G]eomorphologists have developed models that capture the <u>expected sequence of channel changes that follow channel incision</u>. . . .
>
> . . . .
>
> <u>As predicted by channel evolution models</u> [published in 1984 and 1986], channel widening has followed the channel incision of the lower James River. The incision of the James River channel led to over-steepening and collapse of the banks.

<u>Id.</u> at 15-17 (emphasis added).

### B. Plaintiff Undertakes Mitigation Efforts

In 1994, a routine inspection of Fleeg's Bridge "showed significant bed degradation and scouring that had exposed one of the bridge's pilings." Compl. ¶ 34; <u>accord</u> Gustad Aff. Ex. 2 (containing an August 23, 1994 letter from the Yankton County Superintendent of Highways (the "superintendent") that highlighted the "severe scouring and erosion [that] had taken place since the last [biennial] inspection"). The routine inspections were conducted by Johnson Engineering. <u>See, e.g.</u>, Gustad Aff. Ex. 2; Gustad Aff. Ex. 6; Gustad Aff. Ex. 7 at 5. Plaintiff sought and received a permit from the Corps to install rip rap around the piling to protect the piling from further degradation. Compl. ¶ 67. In 1995, the superintendent noted, in discussing a "scour problem" that had formed downstream from Fleeg's Bridge, that the James River had "degraded over the past years." Gustad Aff. Ex. 4. In early 2010, the superintendent apprised the Corps of a "scour hole that [had] developed immediately downstream" of Fleeg's Bridge, and requested a

copy of a terrain surface model developed by the Corps for the area near the bridge. Gustad Aff. Ex. 6. Ultimately, the scouring and erosion led plaintiff to undertake "efforts to halt the effects of the degradation and erosion around Fleeg's Bridge by installing protective rip rap in 1994, 1995, 1998, 2002, 2012, and 2014." Compl. ¶ 69. The rip rap was placed "around pilings and on the banks forming the abutments of the Fleeg's Bridge." Gustad Aff. ¶ 3.

In early 1999, the superintendent and the Corps exchanged correspondence "in regard to the Johnson Bridge project." Gustad Aff. Ex. 5. In 2000, and again in 2016, plaintiff undertook similar efforts with Johnson Bridge as it had with Fleeg's Bridge by "plac[ing] rip rap around pilings and on the banks forming the abutments of the Johnson Bridge" pursuant to permits granted by the Corps.[4] Gustad Aff. ¶ 4; accord Compl. ¶¶ 70-71. For both bridges, the rip rap was designed to "fix erosion and degradation problems and to protect [plaintiff's] property from bed degradation and bank erosion." Gustad Aff. ¶ 5.

### C. Plaintiff Explores Bridge Replacement

Recognizing the need to "investigate the issues facing the Fleeg's Bridge and to work towards a plan for replacement," plaintiff commissioned a report from Black and Veatch Engineers (the "Black and Veatch report").[5] Compl. ¶ 73. The date on which the report was commissioned is not reflected in the record before the court. However, based on the report's reliance on a photograph of the James River taken (ostensibly by or on behalf of the report's author) on March 28, 2011, see Def.'s Mot. Ex. A at 14, it appears that the report was commissioned no later than March 28, 2011. The report was issued on November 17, 2011, Compl. ¶ 73, and incorporates "[h]ydrologic analysis, hydraulic modeling[,] and a review of current and historical topography" in its analysis of the conditions at Fleeg's Bridge,[6] Def.'s Mot. Ex. A at 3. The Black and Veatch report was based on the following primary data:

- peak streamflow data from United States Geological Survey stream gages located eight and eleven miles upstream from Fleeg's Bridge for the years 1929 to 2010, id. at 4;

---

[4] The complaint and the Gustad affidavit contain different dates—2016 and 2015, respectively—for the second rip rap installation with respect to Johnson Bridge. Compare Compl. ¶ 70, with Gustad Aff. ¶ 4. The court uses the date referenced in the complaint. However, the distinction is immaterial to resolving the instant motion.

[5] The Black and Veatch report is reproduced in its entirety at Exhibit A of defendant's motion to dismiss.

[6] The Black and Veatch report refers to Fleeg's Bridge as the "Highway 366 Bridge." See Def.'s Mot. Ex. A at 3, 6, 8, 14, 16-18, 20-21, 24-25.

- topographic profiles of the riverbed below Fleeg's Bridge collected by Johnson Engineering in 1992, 1994, 1995, 1996, 1997, 1998, 2000, 2002, 2004, 2006, 2007, and 2008, id. at 6;

- a topographic profile developed by Johnson Engineering "based on 1950 construction drawings," id.;[7]

- "[s]urvey and site observations" of unspecified dates, id. at 8;

- a West Consultants report commissioned by the Corps in 2002 that "documented degradation trends in the Missouri River" from 1956 to 2001, id. at 9;

- field data collections on August 4, 1994, October 18, 1994, July 7, 1995, and May 21, 1997, id. at 14, 16; and

- a photograph taken on March 28, 2011, id.

In addition, the Black and Veatch report was based on published articles and reports from 1994, 2001, 2002, 2003, 2006, and 2010. Id. at 28.

The author of the Black and Veatch report concluded:

> The Missouri River has degraded significantly and this degradation could migrate upstream into the James River. . . . Long term degradation should be further investigated . . . .
>
> Significant erosion has occurred on the east bank of the [James] River. The erosion has produced about a 20-ft high, almost vertical bank at [Fleeg's Bridge]. . . . Loss of bank material may also occur due to the scour hole [that formed near the bridge]; as the scour hole gets deeper the bank gets steeper and becomes unstable.
>
> . . . .
>
> The highest [water flow] velocities typically occur in the vicinity of the bridge. Bridge abutments and piers constrict the flow and thus velocity increases. The riprap placed to protect the bridge foundations prevents, by design, erosion of the streambed under the bridge and thus velocities remain high through the

---

[7] The record does not reflect when Johnson Engineering developed its topographic profile.

> bridge. Scour then occurs when high velocity flow approaches the
> non-armored section downstream of the riprap.

Id. at 24-25. The author of the report then proposed five alternatives for "protecting [Fleeg's] bridge": scour countermeasures for abutments and piers, bank erosion protection, preventing formation of the scour hole, constructing a sheet pile cofferdam downstream from the bridge, and replacing the bridge altogether. Id. at 25-26.

Over the ensuing years, plaintiff received the following reports:

- Johnson Engineering, Contour Map for Fleeg's Bridge, August 2012, see generally Healy Aff. Ex. 2;

- Black and Veatch, Bridge Scour and Bank Erosion Protection Conceptual Design, February 8, 2013, see generally Healy Aff. Ex. 1;[8] and

- Dr. Reuben Heine, The Impact of Missouri River Degradation on the Lower James River—Geomorphic Assessment of James River Incision at the Johnson and Fleegs Bridges, June 5, 2017 (the "Heine report"), see generally Healy Aff. Ex. 3.

### D. Procedural History

Plaintiff filed suit in this court on April 6, 2017, alleging that the Corps's actions have "physically taken property of [plaintiff] and caused damage to two of [plaintiff's] bridges and their appurtenances without just compensation in violation of the 5th Amendment to the United States Constitution." Compl. ¶ 3. Plaintiff highlights the construction and operation of Gavins Point Dam and the Corps's channelization activities along the Missouri River as causing unnatural degradation and widening of the James River. Id. ¶¶ 17-18, 23, 29-30. Plaintiff alleges that the rivers' "geomorphic processes have been unnaturally intensified by the [Corps's] actions," id. ¶ 41, causing the "premature obsolescence of the Fleeg's Bridge and the Johnson Bridge," id. ¶ 44. Plaintiff avers that it only "recently became aware" that the need to replace the bridges was caused by the Corps, id. ¶ 46, and declares that the statute of limitations on its claim did not begin to run until it received the Black and Veatch report on November 17, 2011, id. ¶ 77.

---

[8] Although the report itself only identifies the month in which it was issued, Healy Aff. Ex. 1 at 1, plaintiff's counsel indicated that plaintiff received the report on February 8, 2013, Pl.'s Resp. 9.

Defendant then filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), arguing that "[p]laintiff has known of the permanent nature of this erosion since at [least] 2000" and thus plaintiff's claim is time-barred. Def.'s Mot. 9. After briefing, the court held oral argument on December 19, 2017. Defendant's motion is now ripe for adjudication.

## II. DISCUSSION

### A. Standard of Review Under RCFC 12(b)(1)

In determining whether subject matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). With respect to a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject matter jurisdiction. Id. The court is not limited to the pleadings in considering subject matter jurisdiction. Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014). If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B. Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a "threshold matter." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). Subject matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case." United States v. Cotton, 535 U.S. 625, 630 (2002), quoted in Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868). Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). Either party, or the court sua sponte, may challenge the court's subject matter jurisdiction at any time. Arbaugh, 546 U.S. at 506; see also Jeun v. United States, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be unequivocally expressed." United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Further, "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2012); White Mountain, 537 U.S. at 472. However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). The Tucker Act simply "confers jurisdiction . . . whenever the substantive right exists." Id. The substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

In addition, to fall within the court's jurisdiction, any claim against the United States filed in the Court of Federal Claims must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501. A cause of action accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988), quoted in San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1350 (Fed. Cir. 2011). The limitations period set forth in 28 U.S.C. § 2501 is an "absolute" limit on the ability of the Court of Federal Claims to exercise jurisdiction and reach the merits of a claim. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-35 (2008). Although equitable tolling of the six-year statute of limitations in the Court of Federal Claims is not available, a claim does not begin to accrue "until the claimant knew or should have known that the claim existed." Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (internal quotation marks omitted). To successfully invoke the accrual suspension rule, a plaintiff must demonstrate that either (1) the government "concealed its acts" or (2) the plaintiff's injury was "inherently unknowable." Id. (internal quotation marks omitted). The "knew or should have known" test for claim accrual is "used interchangeably" with the "concealed or inherently unknowable" test, although the latter is "both more common and more precise." Ingrum v. United States, 560 F.3d 1311, 1315 n.1 (Fed. Cir. 2009).

### C. The Accrual of Plaintiff's Claim

As noted above, the only claim raised in plaintiff's complaint is a Fifth Amendment taking. The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008); accord Mildenberger v. United States, 643 F.3d 938, 944-45 (Fed. Cir. 2011) ("When the Government takes property but fails to compensate the owner, the Tucker Act provides jurisdiction to enforce the owner's compensatory right."). The parties do not dispute that plaintiff has alleged a nonfrivolous Fifth Amendment takings claim. See Compl. ¶¶ 47-55. The sole issue currently before the court is determining when plaintiff's claim accrued.

In the instant case, the alleged taking due to the Corps's actions has occurred not at a discrete moment in time, but through the gradual erosion of the lower James River. Accrual of a takings claim effected by a "gradual physical process" occurs "when the situation has 'stabilized.'" Banks v. United States, 314 F.3d 1304, 1308 (Fed. Cir. 2003). The stabilization doctrine is a manifestation of the accrual suspension rule. A situation stabilizes "when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." Id. (internal quotation marks omitted). "[J]ustifiable uncertainty about the permanency of the taking" thus prevents accrual of a takings claim. Id. at 1309 (internal quotation marks omitted). In other words, the "permanent nature of the taking" must be "evident" for a claim to accrue. Id. (internal quotation marks omitted); see also Mildenberger, 643 F.3d at 944-46 (discussing the development and application of the stabilization doctrine).

Plaintiff identifies the Black and Veatch report as "the first indication that [plaintiff's bridge] problems were the result of a headcut that originated at the Missouri River" because, prior to the report, plaintiff believed the bridge problems were "naturally created." Pl.'s Resp. 5. The Black and Veatch report led plaintiff to conclude that the "streambed degradation and bank erosion" were the "permanent result of the Corps['s] construction and operation of the Gavins Point Dam." Id. at 6. Plaintiff characterizes its "lack of knowledge of its claim" prior to receiving the report as "justifiable." Id. at 7. Plaintiff notes that the Corps recommended installing rip rap in response to scouring discovered during the 1994 routine inspection, and "never expressed concerns that erosion and degradation would continue" despite granting permits for each of plaintiff's mitigation efforts in the ensuing years. Id. at 8.

Defendant contends that plaintiff was aware of the "permanence of the erosion since 2000" because, at that point, plaintiff had "undertaken years of repair efforts at Fleeg's Bridge and began making repairs at Johnson Bridge." Def.'s Mot. 9. Defendant posits that "there are no 'unique facts' that prevented Plaintiff from realizing the permanence of the degradation and erosion" prior to plaintiff receiving the Black and Veatch report. Id. at 11.

Plaintiff is correct that "a claim cannot accrue without knowledge." Pl.'s Resp. 14. However, assuming (without deciding) that plaintiff indeed had a "lack of knowledge of the erosion and degradation's cause," id., plaintiff's lack of knowledge is not dispositive. Ignorance of a claim that a plaintiff "should have been aware of is not enough to suspend the accrual of a claim." Ingrum, 560 F.3d at 1314-15. In essence, plaintiff's argument that the Black and Veatch report "was the first time Plaintiff learned of the Gavins Point Dam's potential impact on the bridges," Pl.'s Resp. 17, invokes the "inherently unknowable" prong of the accrual suspension rule. The "inherently unknowable" test involves a "reasonableness inquiry." Holmes v. United States, 657 F.3d 1303, 1320 (Fed. Cir. 2011); accord Japanese War Notes Claimants Ass'n of Philippines, Inc. v. United States, 178 Ct. Cl. 630, 634 (1967) ("[T]he statute will not begin to run until plaintiff learns or reasonably should have learned of [its] cause of action."). Thus, the court must determine whether plaintiff's alleged ignorance of its claim prior to November 17, 2011, was reasonable. Plaintiff's "access to the facts," rather than plaintiff's "actual knowledge of the facts giving rise to its claim," is what ultimately matters. Central Pines Land Co. v. United States, 61 Fed. Cl. 527, 534 (2004).

The court is compelled to agree with defendant that "[p]laintiff's takings claim was not inherently unknowable" prior to plaintiff receiving the Black and Veatch report. Def.'s Reply 7. "[A]ny matter of public record is by definition knowable. A party will be charged with knowing any facts that are discoverable in public records, and ignorance of one's legal rights arising from those facts is not a sufficient excuse to justify" suspending the accrual of a claim. Central Pines, 61 Fed. Cl. at 534. The Black and Veatch report is based on data, articles, and reports from 2010 and earlier; information collected by Johnson Engineering from 2008 and earlier; and a photograph of the James River taken on March 28, 2011. The data, articles, and reports were publicly available, and plaintiff was not prevented from photographing the river itself on or before March 28, 2011. Further, while the information from Johnson Engineering may not have been in the public domain or in plaintiff's actual possession, it was at least available to plaintiff (and thus in plaintiff's constructive possession) because of the ongoing working relationship between plaintiff and Johnson Engineering. Central Pines stands for the proposition that accrual suspension will not be available "where a claimant could have asserted a claim if it had sought advice, launched an inquiry, or otherwise taken steps to discover available information." Id. Thus, plaintiff cannot delay the accrual of its claim by delaying its investigation (here, by commissioning the Black and Veatch report) when it had access to all of the necessary facts giving rise to its claim. If plaintiff was able to so delay, the six-year statute of limitations set forth in 28 U.S.C. § 2501 would be superfluous.

The holding of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in Banks—that the plaintiffs' claims were reasonably uncertain until after particular reports were issued, 314 F.3d at 1310—does not compel a finding for plaintiff in the instant case. In Banks, the plaintiffs contended that the Corps's construction and maintenance of jetties damaged a lakebed, thereby effecting a taking of the plaintiffs' property without just compensation. Id. at 1305-06. At issue was whether the Corps's mitigation efforts to combat the erosion caused by the jetties prevented the plaintiffs' claims from accruing. Id. at 1307-08. The Federal Circuit determined that because the mitigation efforts undertaken by the Corps "appeared to successfully stave off the damaging effects of the jetties . . . , the accrual of plaintiffs' claims remained uncertain until [reports issued by the Corps] collectively indicated that erosion was permanent and irreversible," and thus the statute of limitations did not begin to run until the reports were issued. Id. at 1310. In the instant case, the necessary reports, data, and photographs that "collectively indicated" the permanence of the erosion were all available to plaintiff no later than March 28, 2011. Plaintiff therefore had access, on or before that date, to all of the information necessary to determine the permanent nature of the alleged taking of its property.

Nor does Mildenberger compel a finding for plaintiff. In Mildenberger, the plaintiffs alleged that the Corps's repeated discharge of waters from a lake effected a taking of their riparian rights along the river into which the released water flowed. Id. at 942-43. The plaintiffs argued that their uncertainty regarding the permanent nature of the consequences of the Corps's actions was justifiable because the Corps had made "numerous efforts and even more promises to mitigate the damage" caused by the discharges. Id. at 947 (internal quotation marks omitted).

The Federal Circuit rejected that argument, explaining that there was "no justifiable uncertainty . . . because the Corps neither undertook nor committed itself to any mitigation activities," and distinguished the case from Banks, in which the Corps had actually undertaken mitigation efforts. Id.

In the instant case, plaintiff characterizes the Corps's approval of permits for plaintiff's mitigation efforts over the years as "continu[ing] to aid [plaintiff's] efforts to fix the erosion and degradation on the James River," Pl.'s Resp. 14, and "acquiescence in Plaintiff's proposed fixes," id. at 16. Plaintiff further posits that such approval is evidence that the Corps either (1) concealed its knowledge regarding the impact of Gavins Point Dam or (2) believed that rip rap would be effective. Id. at 14. Plaintiff overstates the importance of the Corps's permit approvals. Approving permits does not demonstrate that the Corps concealed information or believed the rip rap would provide a permanent solution. Indeed, the Black and Veatch report utilized two reports issued by the Corps in 2002 and 2003 to describe and document the erosion and degradation processes at the site, and there are no facts to suggest that the Corps withheld these reports, or any other information, from plaintiff. Further, simply approving permits does not amount to participation in, or promises of, mitigation efforts. Thus, as in Mildenberger, plaintiff cannot rely on any actions of the Corps as justifying whatever uncertainty plaintiff may have had with respect to the permanency of the erosion and degradation of the lower James River.

Plaintiff nevertheless blames the Corps for "mak[ing] no further inquiry into the cause of the problem" despite the Corps's knowledge, at least since 1994, "that a bridge near the confluence with the Missouri [River] was being compromised by degradation and erosion." Compl. ¶ 79. In so doing, plaintiff attempts to assign fault to the Corps for the same alleged behavior admittedly exhibited by plaintiff itself: knowing of the bridge problems since 1994 without making further inquiry.[9] In his report, Dr. Heine notes that the degradation along the lower James River has followed "a predictable sequence of channel changes," explaining that there are "models that capture the expected sequence of channel changes that follow channel incision" and that the degradation was "predicted by channel evolution models" published in the 1980s. Healy Aff. Ex. 3 at 6, 15, 17. Thus, even though the Heine report was not issued until after the complaint was filed, it demonstrates that the degradation of the lower James River that allegedly caused plaintiff's bridge problems was predictable based on models that were available several decades prior. At some point, plaintiff's purported "unaware[ness]," Pl.'s Resp. 13, of the alleged impact of the Corps's actions on plaintiff's bridges became unreasonable.

---

[9] Plaintiff's assertion is incorrect. The Corps issued a report in 2002 concerning the impact of the Gavins Point Dam, and another report in 2003 concerning the hydrology and hydraulics of the Missouri River. See Def.'s Mot. Ex. A at 28.

Although "determining the exact point of claim accrual is difficult" when, as here, a gradual physical process is involved, Mildenberger, 643 F.3d at 945, the court need not determine the specific date on which plaintiff was required to begin investigating. Whenever it may have been, plaintiff's duty to investigate arose no later than March 28, 2011—the last date on which any data relied upon in the Black and Veatch Report was produced. Since plaintiff's complaint was filed more than six years later, the Court of Federal Claims lacks jurisdiction to entertain this case.

### III. CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

Plaintiff's claim accrued no later than March 28, 2011, more than six years prior to the date on which plaintiff filed its complaint. The Court of Federal Claims therefore lacks jurisdiction to entertain plaintiff's claim.

Accordingly, defendant's motion to dismiss is **GRANTED**. Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE**. No costs. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge